314-0723 People of the State of Illinois, Appellee by Thomas Aredo v. James Walker, Appellant by Scott Maine and Angela Weiss Mr. Maine, you're going to go first. Good morning, Your Honors, Counsel. May it please the Court, my name is Scott Maine and I'm here on behalf of Appellant James Walker along with my co-counsel, Angela Weiss. We're here to argue the first and second arguments of our brief, but obviously if Your Honors have any questions regarding the third argument, we'd be happy to answer those at any time. James Walker is serving the highest possible penalty in Illinois, life without parole. That was true in 1984 as he was 17 years old and Illinois did not permit the death penalty for those under the age of 18. It is somehow more true today as since 2011, Illinois banned the death penalty for all offenders. But either way, he is serving a sentence that the United States Supreme Court has called especially harsh when imposed on a juvenile, because he will inevitably serve a greater percentage of his life in prison than an adult offender. And now that sentence that Mr. Walker is serving has been called into doubt by recent U.S. Supreme Court decisions as well as decisions out of the Illinois courts. We are here because this state cannot countenance Mr. Walker's life sentence unless and until the constitutionally required mitigating factors of youth and all its attendant circumstances have been taken into account by a sentencing court in order to determine whether or not the life without parole sentence that was given was appropriate for this offender. That did not nor frankly could it have happened at his hearing in 1984. And this course must remand for resentencing so that a constitutional sentence may now be imposed. There are three distinct yet interrelated concepts that guide this court in its resolution of this case, and that is obviously the 8th Amendment jurisprudence that I've referred to by the U.S. Supreme Court, the Illinois Proportion of Penalties Clause of our state constitution, as well as our fundamental system of common law. And the characteristic about all three, that they all share unifying principles, that they all share a collective sense of mutability, that they are not fixed, they are always gradually transforming under the reasoned principle of our bench. It is through this lens that this court must view the decisions cited in our brief as well as the decisions cited by the state. A seismic shift has occurred in light of Miller and his companion cases, and courts are still grappling with what that looks like. But here, where the U.S. Supreme Court has clearly distinguished life without parole and death sentences from any others, they keep them in a category unto themselves. In dealing with their uniqueness and the severity and irrevocability of the sentence that's given, there can be no doubt of Miller's applicability to this case. Miller bars courts from imposing a natural life sentence on a juvenile without consideration of their chronological age and the hallmark features of youth, including the immaturity, impetuosity, and the failure to appreciate risk and consequences. But more importantly, the court held, the bottom line holding of the Miller decision, was that under the Eighth Amendment, it required the sentencing court to take into account how children are different, and how these differences counsel against sentencing them to a life without parole sentence. The Davis Court, our Illinois Supreme Court, in deciding whether or not Miller was going to be retroactive in this state, the Davis Court reiterated that a sentencing judge must, that before a sentence can be imposed on a minor, there are these attendant circumstances that have to be taken into account by the court. And the Davis Court also reiterated the language from the U.S. Supreme Court that the appropriate occasion for sentencing a juvenile to this sentence to the harshest possible penalty should be uncommon. And a sentence should be uncommon because of the great difficulty of distinguishing at this early age between the juvenile offender whose crime reflects the transient immaturity of youth and the rare juvenile offender whose crime reflects irreparable corruption. Where once the watchword was adult time for adult crime, the law now recognizes that very few, almost no child is going to warrant the sentence of life without parole. The fact that youth can and do commit horrible crimes is true. This court need look no further than the Miller v. Alabama decision itself. Evan Miller, the 14-year-old in that case, who struck the victim with a baseball bat multiple times, putting a sheet over his head, declaring himself God, setting fire to the trailer in which that victim was found. The U.S. Supreme Court did not say that this would be that rare offender. The U.S. Supreme Court said, before we decide that this sentence is appropriate, we must ensure that youth are being held accountable in age-appropriate ways. They still must be given an opportunity to introduce evidence of their ability to grow and change. And Miller court didn't say that Miller couldn't be sentenced to life on remand. They just said it couldn't be mandatory. Right. When they said that, well, they said it couldn't be mandatory. But it said before you give that sentence, a sentencer was required to take into account how these, take into account his youth and immaturity and all the attendance circumstances they're talking about and how that fact counsels against giving that sentence. So while it's true that Miller, that Davis, the decisions looking at this, no decision has yet gone so far under the rubric of the eighth amendment to say that this sentence can't be given. But they're saying the only way it can be given is after there's been a full and fair consideration of the hallmark attributes of youth. And these things need to be considered in mitigation. That these are things, when the court uses the language of it, these factors counsel against that sentence. They're building in a presumption against the imposition of that sentence. But, of course, that after having a full hearing where this information is taken into account, then that sentence may still be found to be appropriate. Two minutes, please. That was not, the court in Mr. Walker's case in 1984 didn't have that ability. In fact, the understanding that guides these principles was not known at that time. The development of our understanding of adolescent brain development in terms of how they know and appreciate consequences. The sheer fact that five years after Miller, the U.S. Supreme Court was still sanctioning the death penalty for juveniles, is a clear indication of the fact of how much things have changed, the substantive change that has been brought about by these decisions. What is it about this record that suggests to you the trial judge did not consider the fact that he had a young man in front of him? He certainly knew that he had a young man in front of him. But when they were having a sentencing hearing, what they were talking about was whether or not his age would preclude him from the court relying on the so-called death penalty factors, whether or not he fell under the rubric of the 9-1-B factors that would permit a pathway to a discretionary sentence. What was not happening at that hearing was taking into account youth as mitigation. We had defense counsel calling the client a preacher in the streets. There was no witnesses called in mitigation. There was no evidence introduced in mitigation. The simple fact, why we cannot say that the hearing that occurred in 1984 would be satisfactory under the Miller standard, is that after hearing what little was presented in terms of just the sheer fact of his age, was the court found nothing mitigating in this case. And what Miller holds and what the dictates of the Eighth Amendment accord, and Graham, which the court in Miller talks about, nothing that we said in Graham is crime specific. It applies to any time a youth is in front of a court. That youth are categorically less culpable. There is mitigation that has to be accounted for before a judge decides to impose a sentence. So we can't look at this hearing with their understanding of adolescent development and their understanding of the ability to appreciate the risks and consequences and know that that hearing was adequate under the standard. And what is the mitigating evidence? Well, that's why we need a hearing. I mean, we know that mitigating evidence was that this was a 17-year-old that couldn't appreciate in the moment what it actually meant to conduct, and nothing is taken away from the severity of this crime. But what needs to be done is that the defendant should be held accountable in the age-appropriate manner. That there needs to be some consideration of whether or not he deserves the same punishment that we would give an adult for the same offense. And this is the reason why this is the type of case that should get sent back because the U.S. Supreme Court has said, and the U.S. Supreme Court repeated, that the appropriate circumstances, it's going to be rare. The imposition of the sentence should be rare. Well, let me just ask, do you think there's ever a time when a 17-year-old's life without parole is constitutional? At this time, yes. There will be under the guiding dictates of the U.S. Supreme Court, under the 8th Amendment jurisprudence that we have, there would be after a full and fair hearing, after consideration of this and once that consideration is taken into account and how those factors counsel against that sentence, once all that is done and a court is satisfied that this is still an individual who merits that sentence, that could still be appropriate. But the necessary fact that has to happen before we can be to that point is there needs to be a hearing. There needs to be a hearing where these things are taken into account. That's the hearing that the U.S. Supreme Court called for. They said when they guide that sentence, when they were saying that a censor is not precluded from giving this sentence, they require the censor to first look to these factors. And so unless and until those factors have been looked at and taken into account, we can't have any confidence that Mr. Walker is that rare juvenile offender who deserves to serve this sentence. If we agree with you, then how many doors to new sentencing hearings will this open? How many youthful offenders are there currently serving life sentences without parole? There are approximately 100 individuals in Illinois serving a sentence of life without parole. Of those 100, about 75 to 80 are serving a mandatory sentence and around 20 to 25 have a discretionary, so-called discretionary sentence of natural birth. So are we creating a slippery slope if we agree with you? Because I know amphetamine users destroy a portion of their brain regardless of their age that affects their ability to know right from wrong in terms of culpability and future consequences. So are we opening the door to those individuals, regardless of age, that don't have that capacity, would be entitled to a more in-depth sentencing hearing? Or perhaps an elderly person who suffers from dementia may not be eligible for a mandatory life sentence without? I just want you to address the issue of are you asking us to create a slippery slope when, in fact, the youthfulness of this particular offender was very obvious and known to the court? I'm not asking this court to go beyond the four corners of the Miller decision. I'm asking this court to apply the holding of the... We're not asking this is no expansion. This is not creating a slippery slope. This is simply applying... Well, the four corners of the Miller decision deal with mandatory life sentences, and this wasn't one of them. The four corners of the Miller decision, that's the sentence that was in front of the court, but when they said, and this is the... Oh, and that's what they decide is the case in front of them, right? They decide the case in front of them, but they said when making that holding was that... And they were drawing on a couple of lines of precedent. They were obviously drawing on their Roper and Graham and their youth-specific line of decisions, but they were also drawing on their individualized consideration cases coming out of the death penalty. But they didn't just say that there needs to be individualized consideration. They specifically wedded the two into this one idea of this youth-centered jurisprudence, and what they... The holding was not simply... To say that the four corners is just banning a mandatory sentence like parole and send it back for a hearing would be to read out large chunks of the Miller decision, would be to read out the bottom-line holding of requiring a sentencer to take into account the youth-specific factors and how those factors counsel against that sentence. They link life without parole to death penalty cases. They link the severity of the sentence to the death penalty. And so to answer Your Honor's first question in terms of the who in terms of these liberties, we're certainly talking about, in this case, those serving a life without parole sentence, the most severe penalty that the state permits. We're also... I'm sorry. Go ahead and finish. We're also talking about juveniles. We're talking about a 17-year-old. Those, and that's, again, the bright line that the court has still talked about in terms of the age limit, that it's under the age of 18. So we're not asking... This is not creating a new pathway. And obviously, you know, those other avenues are already... Could already be found in Actons, which predated the Roper decision. Actons implying a categorical ban to the death penalty for mental retardation. Arguments are going on simultaneously in terms of what are the full parameters of what special accord and special consideration should be taken into account given the classification of the defendant in front of the bench. Justice Schmitt asked a good question, and that is, what is the mitigation in this case? And this was not a mandatory life imprisonment, correct? Correct. So what is mitigating about this defendant? The man that was killed was, I presume, supporting his family, doing his job, in a car with a beer can between his legs, and he died. He never came home. In every first-degree murder case, Your Honor, there is an... Not necessarily, because people who are maybe involved in criminal activities, shooting guns at each other, you know... I mean, some people aren't nearly as innocent when they die. This man was. He wasn't engaged in any illegal activity. I'm not, and there's nothing you'll hear from us that would take away from the pain and suffering in Mawson. So what is it about your client that the judge is going to learn that's going to change his decision? That this is... First and foremost, all of the understanding of the ability to understand consequences, risks, and consequences, that when a 17-year-old decides to do an armed robbery, decides to, you know, in that moment, sort of in that split second, where they're not able to understand exactly what is happening, and they might take an action that otherwise someone who was 25 may not have done. Practically speaking, how does the judge put himself back in the position he was in when he was looking at that 17-year-old in the courtroom, because your client is now 40? Is that right? He's in his upper right ankle. And maybe he's been a trustee in prison, and maybe he's done some very good things, and maybe he's gotten college degrees. So how does the judge really do this? How does he look back on the 17-year-old offender and fashion a sentence for that person? It's happening throughout our courts in Illinois right now. In fact, this afternoon I'll be participating in a hearing in Cook County on this very question, where we are looking at a case that occurred in 1991. And you won't be arguing this afternoon, look at how he's lived his life in prison. He's going to be a productive person. Under our resentencing statute, one of the things a court can take into account is an individual's behavior since the time of the offense. That is always going to be relevant at the time of sentencing, but that will not overshadow the fact that what we're talking about is a sentencing hearing based on what would an appropriate sentence be for this 17-year-old, now under the understanding that the Eighth Amendment requires, that we need to look at these hallmark attributes of youth in mitigation. Those are the questions that courts are being asked to answer. And those are the questions that judges have to answer all the time when cases get remanded for resentencing. And I'm just not certain on this record that the judge did not fashion a remedy based on everything he knew about the 17-year-old's thing. You don't have to be a brain surgeon to know. Youthful offenders don't think the same way as those in their 40s or 50s, and elderly offenders are a little bit different. The beauty of our system, and I don't mean to lecture you, is we have a human being judging another human being, and I presume the judge who imposed the original sentence was sufficiently mindful of the gravity of that decision. Well, I would point to the fact that throughout the 80s and into the 90s was the notion of the rise of the super predator, the rise of this untamable juveniles who were out committing crimes on our streets. This was the cover of Time Magazine, the cover of Newsweek, this fear that was gripping communities. Okay, I think I've misdirected you into a philosophical discussion, and I don't want to get you in trouble. And I'd be happy to continue. We'll set up a timer. Ms. Weiss? We'll have an entire 15 minutes. Okay, Angela Weiss on behalf of the appellant. Mr. Walker's life without the possibility of parole sentence, which did not adequately account for his special status as a juvenile or his rehabilitative potential, is wholly disproportionate to the offense that he committed, such that it shocks the moral sense of the community, and therefore violates the proportionate penalties clause of the Illinois Constitution. The Illinois Supreme Court has recognized in People v. Clemens that the proportionate penalties clause is not synonymous with the Eighth Amendment of the U.S. Constitution, but rather goes beyond and provides greater protection. One way in which it provides more robust protection is through its emphasis on rehabilitation, as the proportionate penalties clause provides that all penalties in this state shall be determined with the objective of restoring the offender to useful citizenship. This is particularly important in the context of juvenile offenders, because as we now know, juveniles have a greater capacity for rehabilitation than adults. Because their mind is still developing and their character is less fixed, the actions of a juvenile are not a reliable indication of what kind of adult that person will become. This has been formally recognized by the Supreme Court, and the scientific evidence that has supported the decisions in Roper, Graham, and Miller has become stronger each and every year since then. For this reason, Mr. Walker's actual rehabilitation is relevant, and it serves to underscore what the sentencing judge necessarily could not have taken into account, given the prevailing understanding of juvenile brain development at the time. In this case, Mr. Walker has demonstrated his rehabilitative potential. We haven't had the benefit of an evidentiary hearing in this case, so the record is not yet fully developed, but we know from the record, based on an affidavit from his mother, that Mr. Walker has become deeply religious while in prison, and that he's mended the broken relationships with his family members that contributed to his troubled youth. He's also earned his GED and held long-term jobs in prison, and perhaps most importantly, come to fully understand and regret what he did that day as a 17-year-old. Under the Proportionate Penalties Clause, this rehabilitation matters. It means that his current sentence is unjustifiably harsh, because no valid pedagogical purpose in sentencing a juvenile is served by his continued incarceration. When Mr. Walker was sentenced in 1984, his sentence may not have shocked the moral sense of the community. However, the consideration of evolving standards of decency and fairness is central to the analysis under the Proportionate Penalties Clause in determining the validity of a particular sentence. While the Proportionate Penalties Clause goes further than the Eighth Amendment protections, the Supreme Court's decisions in this context are informative in terms of considering how our standard for decency and fairness has evolved. As my co-counsel mentioned, it was four years after Mr. Walker was sentenced that the Supreme Court upheld the imposition of the death penalty on individuals who were under 18 at the time of their offense. It wasn't until 20 years after Mr. Walker was sentenced that the Supreme Court overruled that decision in Roper. Well, there are some other things that have changed in the law, too. For example, if this crime were committed today, it would also be categorized as a hate crime, wouldn't it? I believe Your Honor is referring to the fact that Mr. Walker requested a white cab company. I think that that is a factor that could be considered aggravating. Yes, I also think that those facts have not been fully fleshed out. There's contradicting evidence in terms of who requested what cab company and what motivated that request, so it may or may not be. The law has changed, yes. Another change that has occurred is that Illinois has gotten rid of the death penalty since then, which shows that we're continuing to evolve. Illinois has historically been at the forefront of juvenile law in this country. We were the first state to create a separate court system for juveniles, recognizing that juveniles are different and therefore should be treated differently. Illinois was also ahead of the curve in 2002 when the Illinois Supreme Court decided Leon Miller, which was 10 years before Miller was decided. Well, that brings me to the point. What about the timeliness of this petition? This petition is timely because Miller was not decided until 2015. Well, Miller wasn't decided when Miller brought his appeal either. Correct, it wasn't. But it's clear that if the opponent was not at fault in not bringing these claims, had he brought these claims previously, the law was evolving. And so previously we were not at a point where his sentence shocked the moral sense of the community. If he had brought these claims previously, he would be in the same position as Davis was, where his proportionate penalties claims were res judicata as to him. But here we're in a different case because Mr. Walker did not raise these claims previously, and so they're properly before the court at a time when the standard for fairness and decency has evolved enough such that his sentence now is unconstitutional under the proportionate penalties clause. So in that sense, waiting for these claims, waiting until our society has evolved is appropriate and makes this claim timely. Well, if everybody waits until society has evolved until they make their arguments, society would never evolve, would it? Because if somebody said, well, there's no case that says that, therefore I'm not going to make the argument, I'll just wait. And if everybody takes that attitude, you've got no evolution of the law, right? I take Your Honor's point. I think that people who are sentenced and arguing on direct appeal will do that. I think that your point almost argues against something we see as a lot of inmates filing all kinds of appeals at all times, and this is something that the court system is trying to eliminate. Mr. Walker has not raised successive appeals. He has waited until the time was appropriate to bring these claims. Well, he could have done it in 1985, 86. And had he done it in 1985, none of these cases would have been available to his benefit. That is part of the point is that the sentencing judge did not have the benefit of these cases at the time of sentencing. Well, if he had taken them and won it and been persuasive, the other defendants would have had the benefit in his case when they brought their appeals, right? That is absolutely right. If he had brought it and had won, they would have had the benefit of that. I think it's highly doubtful that in 1985, a court would have found that his sentence was unconstitutional. But in 2016, sentencing a juvenile to die in prison without having a hearing where his youth is taken into account in a meaningful way is violated of the proportionate penalties clause. Just last month, the First District provided another example of how the proportionate penalties clause is continuing to evolve and goes beyond the Eighth Amendment in their decision in People v. House where they held that a defendant's life without parole sentence for an offense he committed at the age of 19 violates the proportionate penalties clause. In that case, the First District recognized that although Miller draws an arbitrary line at the age of 18, the proportionate penalties clause requires that the rationale behind Miller be taken into consideration in sentencing in Illinois, even in cases that don't fit squarely within the lines of Miller for the Eighth Amendment purposes. In this case, we know from the record that the judge did not take youth into account in the mitigating way that is now required under the Illinois and U.S. Constitution because he said that there was, quote, no mitigation, unquote, in this case, which we know is not true based on his youth alone. For the foregoing... Would the judge on resentencing, if we rule it your way, say exactly the same thing? He might say exactly the same thing, but... And if he does? If he does, after considering our client's youth and what it meant in terms of his ability to plan, one thing that the sentencing judge cited was the fact that there was a plan here. Yes, there was a plan. They decided to call a cab company. But something that we know now is that a 17-year-old's ability to plan is limited. He's unable to actually think through the consequences of that plan, which is demonstrated by the fact that their plan was abandoned as soon as the shooting actually occurred. They never finished the robbery. He ran off and began vomiting, right? So now the sentencing judge under Miller would be required to consider youth in a way that is actually meaningful as opposed to just saying, yeah, he's younger, but he did a terrible thing. So it would be different. But yes, the judge would still have the authority to impose the same sentence. Thank you so much. Mr. Roberts. May it please the Court, good morning, Your Honor, Counsel. I guess to change up my argument a little bit, I guess I will address several points more than time considerations and the application of Miller and the other U.S. Supreme Court cases, the record in this case, and also address the House decision. The timeliness issue is relevant because Mr. Walker could have brought this action pretty much any time since 1985. And in 1992, when Leon Miller came out, that was the first time that Illinois courts had considered the differences between youth and adults. So that would, even if you would suggest that, well, there's no other cases in which he could rely upon right there in 1992, you have a case that he could have relied upon. Then in 2005, we have Roper, which originally the U.S. Supreme Court decision discussing the application of youth versus adults. Again, Mr. Walker didn't file his petition until 2013. Then in 2010, we have Graham, and Graham again discussed the differences between youth and adults. Again, no post-conviction petition in 2013. It wasn't until after 2012 when Miller, which again discussed the same types of things only in the context of mandatory life sentences that Mr. Walker filed his petition. The timeliness under any standard was, you did not file it in time, it should be dismissed on that basis. As far as the application of Miller, as Justice Schmidt pointed out, it dealt with specifically the mandatory life sentence with the possibility of parole on juveniles. The Illinois Supreme Court in Davis and Patterson has said that they have not expanded, at this time, the application of the rule in Miller. Therefore, Miller does not apply under Illinois Supreme Court precedent to this particular case because discretionary life sentences are allowed under Illinois Supreme Court precedent. As I pointed out, perhaps this case goes up, perhaps other cases go up to Illinois Supreme Court or the United States Supreme Court, but at this time, the standing of how the law is, this court does not really have discretion to go beyond what the Illinois Supreme Court has decided. As far as the record in this case, the youth was considered. I will point out, it's on page 8 in our brief, what the defense counsel argued. It was not only the fact that he was 17 years old, but all these other considerations. The defendant had a family counselor that he had been referred to and had a counseling report that talked about problems with his family, some psychological issues, family, social, sexual, and educational problems. There was mitigating evidence that was presented, including the age of the defendant. He says the defense counsel repeated that this was a 17-year-old person. I don't think the court, in considering this matter properly, can say that this 17-year-old in these circumstances wants a natural life imprisonment. That was the argument presented. Even if we don't have the juveniles are different, we should consider that. If you go look at what he had to consider in this case, there was a lot of mitigation that was presented in this pre-sentence report and in the argument of counsel. So there was a discretionary life sentence entered. You look at the facts of this case. It wasn't merely, were you not considering the consequences? Oh, yes, he was considering the consequences. When he called, he wanted a white cab company, and he was planning on killing the person to prevent identification. That's considering consequences. So he wants to make sure, the judge wanted to make sure, that this was brutal and heinous. He wanted to make sure the defendant was punished appropriately. Also consider that the co-defendant in this case received only 35 years. The judge considered the different applications of the law to these two individuals who are charged with the same murder, and the accountability versus the actual pulling of the trigger with malice of forethought, because he knew he was going to have to kill this person, and he did. So there is absolutely nothing that could be presented more, really, other than having a judge go back in the time machine, and having Judge Miller versus Alabama, and say, look at this and consider it. And the judge, there's nothing to say that he didn't already consider his age. The post-conviction trial judge found the trial judge considered that. There's nothing that suggests that he didn't. And as far as saying there's nothing in mitigation, as Your Honor pointed out, there's no requirement that he set forth each and every factor that he is saying, I'm considering this, I'm considering this, I'm considering this. What you would ask now is to set up a separate rule that a judge has to say, I considered this particular factor in my sentence. And there's nothing in the law in Illinois that requires that at this juncture. Finally, I just want to touch briefly on House. If you go back to the Roper decision, the Roper decision specifically addresses the 18-year-old demarcation line, and says there has to be a line that's drawn, and society has chosen that 18-year-olds is what they decide between an adult and a juvenile. And so, just on Roper alone, I think the House is wrong to decide, and I'm sure, well, it's true of things with the Supreme Court, but if it's addressed, they will reverse that. I think it's very wrong to decide that. Also, they cited McIntyre, which is a Seventh Circuit decision. I've responded to that. I just wanted to reiterate that in the dissent there, as Judge Ripple pointed out, even if the defendant goes back and files a successive petition, nothing Davis suggested would get the relief. That's what the judge's comments were. For all those reasons and reasons stated in our brief, we would ask that this court defer. Thank you. Any questions? All right. Thank you, Mr. Ryder. And who's going to respond? Mr. Mann. Then you have five minutes. Thank you, Your Honors. I'm going to be mindful of time since I did take up more than originally wanted. There are three areas I'd like to cover in my bottle. The first is the question of timeliness, and there's nothing in our case law that's barring the timing of when one brings a proportionate penalties clause. Obviously what guides the proportionate penalty clause, as well as what guides the Eighth Amendment, is an evolving standard. The Eighth Amendment is an evolving standard of decency that marks the progress of a maturing society. And the Illinois Supreme Court, in terms of our proportionate penalty, says we have never defined the reach of this concept because as our society evolves, so too do our concepts of elemental decency and fairness, which shape the moral sense of the community. But to speak then directly to the Eighth Amendment claim, in terms of when Mr. Walker should bring this claim under the Eighth Amendment, neither Miller, Roper, or Graham provided a clear path to relief in the way that the Miller decision does. The Miller decision's holding requiring the court to take into account these things before imposing a life-without-parole sentence. That is the holding that entitles Mr. Walker to this resentencing hearing, and it could not be found within the strictures of the previous decision. So under the Illinois Supreme Court decision in Davis, when deciding the cause and prejudice test as to whether or not Mr. Davis had brought the claim in a timely fashion, the court found that both cause and prejudice were satisfied, and the prejudice, obviously, it was specifically timed to, that now that individual was going to have this hearing at which these individual characteristics would be taken into account. Well, our Post-Conviction Hearing Act is not constitutionally mandated, right? Correct. And it's a statutory remedy. Yes. And it's got some time guidelines. Yes. Okay. And so are you saying because it's a proportional, because there's a constitutional issue under here that those timelines don't apply? I think we still have to make a showing that the claim was brought within a reasonable amount of time, and this claim was brought within a year of the Miller decision coming down. What about Leon Miller? Leon Miller does, again, Leon Miller, courts have taken pains to, when other individuals had brought claims under Leon Miller, courts took real pains to say that the sort of the perfect storm, holy trinity of awful that happened to the defendant, Leon Miller, was very fact specific, that they certainly were drawing upon principles of proportionality in terms of what is or what is not right. But they were also very much talking about the notion of accountability. They were talking about the notion of the specific age, and they were not deciding under the Eighth Amendment. They were deciding under our laws, the Illinois Constitution. But the specific, what Leon Miller is indicative of is, again, to my co-counsel's point, is that Illinois has always taken pains to provide additional protections to youth and adolescents when they're in front of the courts. But in terms of whether or not a 17-year-old would be able to take advantage of any sort of direct holding out of Leon Miller, the case law was not in individuals' favor. To my knowledge, one individual on a collateral attack that ever received relief under Leon Miller. I guess what I'm trying to figure out how, if your argument, because of this constitutional claim, a prerequisite for a post-conviction claim is a constitutional violation. Correct. So it would seem to me that your argument would swallow the time limits within the statute across the board. There's going to come a time, I would imagine, say five years from now, if someone were to try to bring a Miller claim for the first time, there would be a reasonable argument to ask, why did you wait five years after the Miller decision before you brought this claim? And they would have to make some sort of a showing to demonstrate why they waited that amount of time. This is not that case. Here we have a defendant that made the decision to file this claim within a year of the Miller decision. But even Miller, you agree, is not on all fours. Miller was, they were talking about mandatory. The defendants in front of the court in Miller had both received mandatory sentences, but the court's holding that specifically, and to quote the language, that although we do not foreclose a sentencer's ability to make that judgment, the judgment to impose a natural life sentence in homicide cases, we require it to take into account how children are different and how those differences counsel against irrevocably sentencing them to a lifetime in prison. Before we give this sentence, we must follow this process. And this process is not just individualized consideration, not just looking at their age, but how that age counsels against giving that sentence. We need to arrive somehow in order to ensure that it's only the rare juvenile offender who gets that sentence. And the way that we ensure that it's the rare juvenile offender who gets that sentence is by having the hearing that the Miller court requires. And so the timing issue, I think, is absolutely appropriate under the case law in terms of what would be reasonable understanding that Miller was the case that gave Mr. Walker his right to make this claim. What is the cause and prejudice, then? Well, the cause was that there wasn't this decision. I mean, it's paragraph 42 of the Davis decision. In terms of the requisite cause and prejudice of the Post-Conviction Hearing Act, Miller's new substantive rule constitutes cause because it was not available to earlier counsel and constitutes prejudice because the Miller holding applies to the defendant's sentencing hearing. So we have to apply that hearing to the hearing that took place. And unless one can be satisfied that the hearing that took place existed in such a manner in which these hallmark attributes were used, as we understand them now under this Eighth Amendment understanding, that these things were taken into account and all these things counseled against the imposition of that sentence and the court still determined that the sentence was appropriate, then we could be satisfied that that sentence meets the Eighth Amendment threshold. Thank you all so much. Any further questions? Thank you, Mr. Manning, and thank you all for your argument today. We will take this matter under advisement and get back to you with a written disposition within a short time. We will now take a short recess.